PERETORE & PERETORE, P.C.  
191 Woodport Road  
Sparta, New Jersey 07871  
(973) 729-8991  
Attorneys for Secured Creditor  
People's United Equipment Finance Corp.

Hearing Date: _____, 2015  
Hearing Time: ___:00 a.m.  
Hearing Vicinage: Newark

  _/s/ Scott D. Chait_____  
Scott D. Chait, Esq.  
SDC#5605

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------  
                         :  
In re:                  :  
                        :  
                        :  
**UNITED CRANE RENTALS, INC.**  :  
                        :  
            Debtor.    :  
                        :  
                        :  
                        :  
-------------------------------------------------------

Case No. 15-25024 (RG)

Chapter 11

---

MEMORANDUM OF LAW OF PEOPLE'S UNITED EQUIPMENT FINANCE CORP. IN SUPPORT OF ITS MOTION TO DISMISS OR CONVERT THE WITHIN BANKRUPTCY CASE; OR, IN THE ALTERNATIVE, FOR AN ORDER PROHIBITING THE USE OF CASH COLLATERAL

---

PERETORE & PERETORE, P.C.  
Attorneys At Law  
191 Woodport Road  
Sparta, New Jersey 07871  
(973) 729-8991  
Attorneys for People's United Equipment Finance Corp.

Scott D. Chait, Esq.  
On the Brief

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of secured creditor People's United Equipment Finance Corp. ("PUEFC") in support of its motion to dismiss or convert the within bankruptcy case; or, in the alternative, for an order prohibiting the use of cash collateral.

The within bankruptcy warrants dismissal (or conversion to a chapter 7 liquidation) because debtor United Crane Rentals, Inc. ("Debtor") did not file the case in good faith as it has no likelihood of reorganizing. The simple arithmetic mandates a dismissal: PUEFC alone is owed more than $6,000,000.00 and Debtor generated revenue in the anemic gross amount of only $167,373.56 between January 1, 2015 and July 15, 2015 (annualized at that rate, Debtor will have gross revenues of $286,926.10 for all of 2015). In addition, Debtor only generated about $85,000.00 in revenue in all of 2014. Also, Debtor owes the International Union of Operating Engineers Local 825 Employee Benefit Funds (the "Operating Engineers Union") more than $965,000.00 pursuant to a judgment and, upon information and belief, as a consequence of the significant debt owed to the Operating Engineers Union, Debtor is not being supplied with any union workers that are integral to its business operations. Moreover, Debtor's recently produced "aging reports" reflects stale accounts receivables dating back to 1999 and approximately half of the receivables generated between January 1, 2015 and July 15, 2015 ($81,471.47) are well over 120 days past due. Still further, although Debtor filed its petition more than a week ago on August 10th, it still has not filed any schedules and has neither obtained PUEFC's consent to use cash collateral or an order of the Court for same. Thus, Debtor is either using cash collateral in direct violation of the United States Bankruptcy Code, a clear act of post-petition bad faith, or its operations are so dormant it doesn't even need to write a check. In short, Debtor has no viable business operations, nor any legitimate prospect of same. Chapter 11 is designed and is intended to

reorganize pre-petition debt, not to generate and run-up post-petition debt; neither of which Debtor

will ever be able to repay.  Because Debtor clearly cannot operate at anywhere near breakeven --

much less a profit -- and Debtor cannot possibly confirm a plan of reorganization, the within

bankruptcy case is not only a waste of valuable judicial resources, but will unnecessarily run-up

substantial post-petition debt and administrative expenses which will never be repaid.  This process

will merely serve to generate mounting administrative expenses, with no tangible benefit, and

indeed great harm, to Debtor and its creditors, including PUEFC.

Therefore, this Court should grant PUEFC's motion and dismiss the within bankruptcy case

(or, alternatively, convert it to a Chapter 7 liquidation).

## TRANSACTIONAL HISTORY

The accompanying Certification of Andrew G. Remias (the "Remias Cert.") establishes the

following:

**A.  Background**

1.      PUEFC provided commercial financing to Debtor relative to, and secured by, various

construction cranes and equipment, as well as all of Debtor's assets.

**i.  The 2008 Transaction.**

2.      On or about September 10, 2008, Debtor, as maker, executed and delivered to PUEFC

a Promissory Note in the original amount of $1,286,940.00 to be repaid in 60 consecutive monthly

payments commencing on October 15, 2008 ("Note No. 1").  The Note No. 1 obligations were

modified pursuant to an Extension, dated September 29, 2009 (the "Extension"), executed and

delivered by Debtor to and in favor of PUEFC whereby Debtor acknowledged being indebted to

PUEFC under Note No. 1 in the amount of $1,179,695.00 as of that date, and to repay same in 55

consecutive monthly installments commencing on December 1, 2009. True and correct copies of the

Extension and Note No. 1 are attached to the Remias Cert. and incorporated herein as Group Exhibit

"A."

3.      To secure the payment and performance of all indebtedness, obligations and liabilities

of Debtor to PUEFC of whatever kind, whether previously, contemporaneously or subsequently

incurred or created, including, but not limited to, Note No. 1, pursuant to a Security Agreement

executed by Debtor simultaneously with Note No. 1 and in favor of PUEFC ("Security Agreement

No. 1"), Debtor pledged and granted to PUEFC a security interest/lien in, to an against:  (i) those

cranes more particularly described on Schedule "A" annexed to Security Agreement No. 1, including

all attachments, accessions and accessories to, and all proceeds of, all of the foregoing ("Equipment

No. 1"); and (ii) all other assets of Debtor (the "Blanket Collateral").  A true and correct copy of

Security Agreement No. 1 is attached to the Remias Cert. and incorporated herein as Exhibit "B."

4.      PUEFC perfected its security interest/lien in, to and against the Equipment No. 1 and

the Blanket Collateral by filing a UCC financing statement with the Department of Treasury, UCC

Section, for the State of New Jersey.  A true and correct copy of the financing statement is attached

to the Remias Cert. and incorporated herein as Exhibit "C."

**ii. The 2010 Transaction.**

5.      On or On or about January 21, 2010, Debtor, as maker, executed and delivered to

PUEFC a Promissory Note in the original amount of $11,940,000.00 ("Note No. 2") to be repaid in

62 consecutive monthly payments commencing on January 21, 2010.  A true and correct copy of

Note No. 2 is attached to the Remias Cert. and incorporated herein as Exhibit "D."

6.      To secure the payment and performance of all indebtedness, obligations and liabilities

of Debtor to PUEFC of whatever kind, whether previously, contemporaneously or subsequently

incurred or created, including, but not limited to, Note No. 2, pursuant to a Security Agreement executed by Debtor simultaneously with Note No. 2 and in favor of PUEFC ("Security Agreement No. 2"), Debtor pledged and granted to PUEFC a security interest/lien in, to an against: (i) those certain cranes and vehicles more particularly described on Schedule "A" annexed to Security Agreement No. 2, including all attachments, accessions and accessories to, and all proceeds of, all of the foregoing ("Equipment No. 2"); and (ii) the Blanket Collateral.  A true and correct copy of Security Agreement No. 2 is attached to the Remias Cert. and incorporated herein as Exhibit "E."

7.      PUEFC perfected its security interest/lien in, to and against the Equipment No. 2 and the Blanket Collateral by filing another UCC financing statement with the Department of Treasury, UCC Section, for the State of New Jersey and noting its lien on the certificates of title relative to the vehicles.  A true and correct copy of the financing statement and certificates of title are attached to the Remias Cert. and incorporated herein as Group Exhibit "F."[1]

**B. Cross-Default, Cross-Collateralization and Acceleration.**

8.      The indebtedness, obligations and liabilities owed by Debtor to PUEFC under the Notes and the Security Agreements (collectively, the "Loan Documents") are cross-defaulted.

9.      The Equipment and the Blanket Collateral all cross-collateralize and cross-secure all of the indebtedness, obligations and liabilities owed by Debtor to PUEFC, including, but not limited to, each of the Loan Documents.

10.     The Loan Documents provide that upon Debtor's default, inter alia, PUEFC is entitled to (i) accelerate all indebtedness due under the terms of Notes; and (ii) immediate and permanent title and possession to the Equipment and Blanket Collateral.

---

[1] At times, the Extension, Note No. 1 and Note No. 2 are collectively referred to as the "Notes;" Security Agreement No. 1 and Security Agreement No. 2 are collectively referred to as the "Security Agreements;" and Equipment No. 1 and Equipment No. 2 are collectively referred to as the "Equipment."

## C. Default

11.     Debtor has chronically been in default of its payment obligations owed under the Notes, respectively, and failed and refused to make the required payments as promised.

### i. The Restructure Agreement Obligations.

12.     On or about January 23, 2014, Debtor and non-debtor guarantor of Debtor's obligations to PUEFC, Timothy H. Shinn ("Shinn[2]"; and collectively with Debtor, "Obligors") and PUEFC executed a Restructure Agreement ("Restructure Agreement"), whereby Obligors, inter alia, acknowledged being jointly and severally liable to PUEFC under the Loan Documents in the amount of $7,965,260.67 as of January 14, 2014 and agreed to repay same in 61 one consecutive monthly payments.  A true and correct copy of the Restructure Agreement is attached to the Remias Cert. and incorporated herein as Exhibit "G."

13.     Pursuant to the Restructure Agreement, Obligors also agreed:  (a) to surrender ten (10) items of the Equipment (the "Surrendered Equipment") to PUEFC or its agent, no later than February 15, 2014, assembled, in good condition and repair, and operational; and (b) the Surrendered Equipment would be sold via private sale or auction.

### ii. Additional Defaults Under The Restructure Agreement.

14.     None of the Surrendered Equipment was surrendered to PUEFC by the February 15, 2014 deadline.  Obligors thereafter surrendered nine (9) of the ten (10) items of the Surrendered Equipment (the "Partial Surrendered Equipment") to PUEFC.

15.     In or about August and December, 2014, the Partial Surrendered Equipment was sold at auctions (the "2014 Auctions"), with the consent of the Obligors, for the reasonable market value

---

[2] On or about October 24, 1997, Shinn executed and delivered to PUEFC a personal absolute, unconditional and continuing guaranty of all indebtedness, obligations and liabilities owed by Debtor to PUEFC under the Loan Documents (the "Guaranty").

of those items when sold, and the corresponding net proceeds derived from the 2014 Auctions, in the

aggregate amount of $2,014,194.41, were credited to the indebtedness owed by Obligors to PUEFC

under the Loan Documents, Guaranty and Restructure Agreement, respectively, upon PUEFC's

receipt of same.

16.     In addition to having failed and refused to surrender all of the Surrendered Equipment

to PUEFC in a timely manner, Obligors have also failed and refused to make virtually any of

monthly payments as promised under the Restructure Agreement.

17.     Pursuant to the Restructure Agreement, Obligors were required to, inter alia, pay the

monthly amount of $55,488.00 to PUEFC, commencing on February 28, 2014 through and including

July 28, 2015, for the total amount of $998,784.00 during this time period; however, Obligors only

remitted the sum of $135,976.00 and are in payment arrears to PUEFC in the amount of

$862,808.00, plus late charges, continuing interest and attorneys' fees.

18.     Due to the repeated and continued defaults by Obligors, PUEFC made demand upon

Obligors for payment of the unpaid balance due under the terms of the Loan Documents, Guaranty

and Restructure Agreement, but Obligors failed and refused to pay the indebtedness owed to PUEFC.

19.     PUEFC also made demand upon Obligors to surrender all of the remaining items of

Equipment and Blanket Collateral in their custody, control and/or possession to PUEFC; however,

Obligors only permitted PUEFC to obtain possession of the following (the "Additional Equipment"):

| Quantity | Year | Model | Description of Collateral | Serial Number |
|----------|------|-------|---------------------------|---------------|
| One (1) | 2006 | RT760E | Grove 60 Ton Hydraulic Crane with 110' Boom, 16-110' 4 Section Boom, LMI & Anti Two Block, Full Light Package, 4 x 4 x 4, 29.5 x 25 - 28 Bias Ply Tires, Aux Hoist Pkg, Convenience Pkg, Air Cond., 60 T Hook Blk, 7.5 Ball, 360 Degree Swing Lock, Full Alum. Decking, Cummins QSB 5.9, 6 Cyl Diesel Eng. | 225265 |
| One (1) | 1996 | RT635C | Grove 35 Ton Rough Terrain Crane | 83413 |

| One (1) | 2000 | RT-335 | Terex 35 Ton Rough Terrain Crane Equipped with 94' Main Boom, 30' Jib, Block and Ball | 11618 |
| One (1) | 2000 | RT-335 | Terex 35 Ton Rough Terrain Crane Equipped with 94' Main Boom, 30' Jib, Block and Ball | 11481 |
| One (1) | 1978 | Omega 40 | P&H 40 Ton Rough Terrain Crane | 47111 |
| One (1) | 1991 | LCD180 | Lorain 18 Ton Rough Terrain Crane | 99134 |
| One (1) | 1972 | MLD30 | Pettibone 18 Ton Crane | 1811A1-7599 |
| One (1) | 1972 | MLD30 | Pettibone 18 Ton Crane | |
| One (1) | | 68 | Grove 10 Ton Industrial Crane | |

20.    On or about June 20, 2015, the Additional Equipment was sold at auction (the "06/20/15 Auction") for the reasonable market value of those items when sold, and the corresponding net proceeds derived from the 06/20/15 Auction, in the aggregate amount of $400,000.00, were also credited to the indebtedness owed by Obligors to PUEFC under the Loan Documents, Guaranty and Restructure Agreement, respectively, upon PUEFC's receipt of same.

21.    On or about June 26, 2015, pursuant to the terms of the Security Agreements, Restructure Agreement, Uniform Commercial Code as codified in this State, and applicable law, PUEFC peacefully took possession of one (1) Demag 600 Ton All Terrain Crane, serial number 84072 (the "Demag Crane").  Once the Demag Crane is sold, PUEFC will credit the corresponding net sale proceeds to the indebtedness owed by Obligors to PUEFC under the Loan Documents, Guaranty and Restructure Agreement, respectively, upon PUEFC's receipt of same.

22.    Notwithstanding the demands upon Obligors for surrender of all of the remaining Equipment and Blanket Collateral in Defendants' custody, control and/or possession to PUEFC, Obligors failed and refused to surrender the following to PUEFC (the "Remaining Equipment"):

| Quantity | Year | Model | Description of Collateral | Serial Number |
|---|---|---|---|---|
| One (1) | 1997 | RTG35 | Grove 35 Ton Rough Terrain Crane | 84335 |
| One (1) | 2001 | LTM1100 | Liebherr 120 Ton All Terrain Crane with 5-Axle Crane Carrier, Drive 10 x 6, Superstructure, Counterweight 77,200 lb., Double Swing-Away Jib 35' to 62', 23 ft. Lattice Extension for telescopic boom, Second Hoist, 3-Sheave hook-block, capacity 65 t, Crane Hook, capacity 9.7 t, Radio carrier cabin, 20.5 R 25 Tires including spare, Rooster sheave + 2" boom head top sheave | 065141 |
| One (1) | 2002 | LTM 1060/2 | Liebherr 70 ton All Terrain Crane including but not limited to the following:  Basic machine, consisting of 4-Axle Crane Carrier; Drive 8 x 6; 20.5 R 25 tires including spare; Superstructure; Counterweight 26,500lb; Double swing-away jib 31' to 56'; Second hoist; 3-sheave hook-block, capacity 42 t; Crane hook, capacity 6.3 t; Counterweight configuration for 20,000lb axle loads; Replacement counterweight for 2nd winch; Liccon work planner + dongle; Drum rotation indicators; Rooster sheave + 2nd boom head top sheave | 057414 |
| One (1) | 2000 | CH613 | Mack Tractor | 1M2AA18Y2YW133493 |
| One (1) | 1998 | CH613 | Mack Tractor | 1M2AA18Y2WW094479 |
| One (1) | 1996 | GMK4085 | Grove/Krupp 80 Ton Hydraulic Truck Crane with 125' Main Boom, 52' Jib | 4070-8130 |
| One (1) | 2000 | GMK6220 | Grove 220 Ton All Terrain Crane | 62009012 |
| One (1) | 1994 | KMK3045 | Krupp 45 Ton All Terrain Crane | 30457303 |
| One (1) | 1999 | T340 | Terex 40 Ton Hydraulic Truck Crane | 11488 |
| One (1) | 1995 | 8042 | Sky Trak Lift Truck | 0792 |
| One (1) | 1995 | 2250 JBT | USTC 22.5 Ton Boom Truck Crane | XX3394 |

together with all other attachments, accessions and accessories thereto.

23.    As a result of the defaults by Obligors under the Loan Documents, Guaranty and Restructure Agreement, PUEFC exercised its option to accelerate the unpaid balance of the indebtedness due thereunder.

24.    As of August 7, 2015, Obligors were jointly and severally indebted to PUEFC in the accelerated amount of $6,199,739.78, plus continuing interest, costs and fees, including, but not

limited to, attorneys' fees, under the Loan Documents, Guaranty and Restructure Agreement, respectively.

25.     Upon information and belief, the Remaining Equipment is not currently adequately insured.  Moreover, Debtor's insurance premium was due and the payment was not made. As such, because the Remaining Equipment at times traverses public roads and highways, the general public is at great risk of loss if the Remaining Equipment is being used while uninsured.  Similarly, if the Remaining Equipment is damaged or destroyed, PUEFC will sustain significant loss.

26.     Upon information and belief, the Remaining Equipment currently is not being properly maintained and/or serviced, which could pose a great risk to the general public if operated in disrepair or poor condition.

27.     The Remaining Equipment depreciates in value on a regular basis.

**D. State Court Action and Order of Replevin**

28.     Due to the aforesaid defaults, on July 6, 2015, PUEFC filed a Verified Complaint in the Superior Court of New Jersey, Law Division, Union County, against the Obligors. PUEFC also simultaneously brought an Order to Show Cause for an Order of Replevin with respect to the Remaining Equipment and, on July 8, 2015, the Court entered an Order to Show Cause for Obligors to demonstrate why such a replevin order should not be entered in favor of PUEFC.  After opportunity for opposition and oral argument, on August 7, 2015, the Court granted PUEFC's application and entered an Order of Replevin with respect to the Remaining Equipment (the "Replevin Order").

29.     Rather than comply with the Replevin Order, Debtor filed the within bankruptcy proceeding.

**E. Debtor's Dire Financial Condition**

30.     Based upon a list provided by Debtor to PUEFC in July 2015, Debtor has generated revenue in the gross amount of only $167,373.56 between January 1, 2015 and July 15, 2015.  In addition, Debtor only generated about $85,000.00 in revenue in all of 2014.  Also, the Operating Engineers Union recently obtained a judgment against Debtor in excess of $965,000.00 and, upon information and belief, as a consequence of the significant debt owed to the Operating Engineers Union, Debtor is not being supplied with any union workers that are integral to its business operations. Moreover, Debtor has advised PUEFC that is has not prepared any financial documents since 2013 and Debtor's recently produced "aging reports" reflects stale accounts receivables dating back to 1999 and  approximately half of the receivables generated between January 1, 2015 and July 15, 2015 ($81,471.47) are well over 120 days past due.  In addition, as set forth above, Debtor's insurance premium was due and the payment was not made. In short, Debtor has no viable business operations, nor any legitimate prospect of same.

## PROCEDURAL HISTORY

31.     On August 10, 2015 (the "Petition Date") -- 1 business day after the Replevin Order was entered -- Debtor filed a voluntary petition for relief (the "Petition") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey under case number 15-25024.

32.     On the Petition Date, PUEFC objected to Debtor's use of cash collateral. A true and correct copy of PUEFC's counsel's letter, dated August 10, 2015, is attached to the accompanying Certification of Scott D. Chait, Esq. (the "Chait Cert.") as Exhibit "A" and is incorporated herein. Debtor's counsel advised on August 12, 2015 that Debtor has been advised not to use any cash collateral. A true and correct copy of Debtor's counsel's email, dated August 12, 2015, is attached to

the Chait Cert. as Exhibit "B" and is incorporated herein. Notably, counsel did not confirm that

Debtor isn't using cash collateral, only that Debtor has been instructed not to use cash collateral.

## LEGAL ARGUMENT

## POINT ONE

I.    **AS A MATTER OF LAW, THE WITHIN BANKRUPTCY CASE SHOULD BE DISMISSED (OR CONVERTED TO A CHAPTER 7 LIQUIDATION)**

    A. **A Chapter 11 Case May Be Dismissed (or Converted) for Cause, Including a Debtor's Bad Faith in Filing the Bankruptcy, Such as is the Case Here**

        *1.    It is well established that a bad faith filing is sufficient cause to dismiss (or convert) a Chapter 11 case*

Pursuant to 11 U.S.C. § 1112(b), a bankruptcy case may be dismissed (or converted) where the movant establishes cause.  While "cause" is not specifically defined in the Bankruptcy Code, Section 1112(b) sets forth a non-exclusive list of grounds which might constitute cause, including where there is a "continuing loss to or diminution of the estate *and absence of a reasonable likelihood of rehabilitation*." 11 U.S.C. § 1112(b)(1) (emphasis added). "It is well established that a debtor's bad faith filing of a bankruptcy petition is sufficient 'cause' to warrant dismissal of the case under § 1112(b)". In re Ravick Corp., 106 B.R. 834, 842.  Courts have dismissed cases as bad faith filings for a variety of reasons, including, but not limited to, when the petition was filed merely to frustrate the rights of others or as a litigation tactic, or when the debtor lacks a valid reorganizational purpose.  In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999); see also In re Y.J. Sons & Co., Inc., 212 B.R. 793, 802 (D.N.J. 1997) ("The absence of any likelihood of rehabilitation has been considered grounds for bad faith dismissal") (citing In re Ravick Corp., 106 B.R. 834, 842-843 (Bankr. D.N.J. 1989)); In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984) ("In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions. *Particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate*

*efforts of secured creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate*" (citations omitted) (emphasis added)).

Regarding a debtor's financial structure and pre-petition conduct, courts have set forth, amongst others, the following non-exclusive list of specific factors to consider in analyzing a bad faith filing:  there is no, or minimal, cash flow and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to the Bankruptcy Code.  In re Ravick, 106 B.R. at 843 (citations omitted); see also In re Y.J. Sons & Co., Inc., 212 B.R. at 802 (citation omitted).

While the moving party bears the initial burden to prove a prima facie case of a bad faith filing, once established, the burden then shifts to the debtor to prove good faith.  In re Ravick Corp., 106 B.R. at 842; In re SGL Carbon Corp., 200 F.3d at 165, footnote 10 ("Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in "good faith").

### 2. *Debtor's bankruptcy is a bad faith filing*

The within bankruptcy case is a bad faith filing.  The case simply could not have been filed to achieve the valid, legitimate purposes of the rehabilitate provisions of Chapter 11 because Debtor has, for all intents and purposes, ceased to exist as a viable concern and has no legitimate business prospects.  While Debtor's pre-petition conduct speaks volumes as to the lack of good faith (e.g., one business day after the Replevin Order was entered, Debtor filed the within case), most compellingly is the simple fact that there is no realistic possibility of an effective reorganization, and this case will only serve to run-up substantial post-petition administrative expenses and obligations which will never be paid, all at great cost to Debtor's creditors.

a) *Debtor is not a viable, going concern; it has insufficient cash flow and no legitimate business operations or prospects*

Debtor is, for all intents and purposes, no longer a viable concern; nor has Debtor been a viable business for a protracted period of time. Based upon a list provided by Debtor to PUEFC in July 2015, Debtor has generated anemic revenue in the gross amount of only $167,373.56 between January 1, 2015 and July 15, 2015 (annualized at that rate, Debtor will have gross revenues of $286,926.10 for all of 2015). In addition, Debtor only generated about $85,000.00 in revenue in all of 2014. Also, Debtor owes the Operating Engineers Union in excess of $965,000 pursuant to a judgment and, upon information and belief, as a consequence of the significant debt owed to the Operating Engineers Union, Debtor is not being supplied with any union workers that are integral to its business operations. Moreover, Debtor has advised PUEFC that it has not prepared any financial documents since 2013 and has no proper aging reports with respect to accounts receivable. Indeed, the purported aging report previously provided to PUEFC reflect stale accounts receivables dating back to 1999 and approximately half of the receivables generated between January 1, 2015 and July 15, 2015 ($81,471.47) are well over 120 days past due. Thus, with such anemic cash flow and dire business prospects, Debtor cannot, as a matter of law, confirm a plan of reorganization.

Further, PUEFC objected, on the day the Petition was filed, to Debtor's use of cash collateral and yet, incredibly, Debtor has taken no action to obtain a court order authorizing its use of same. See letter to Debtor's counsel, dated August 10, 2015, Exhibit "A" to the Chait Cert.[3]. Debtor's counsel advised on August 12th that Debtor has been advised not to use any cash collateral. See Exhibit "B" to Chait Cert. Notably, counsel did not confirm that Debtor isn't using cash collateral, only that Debtor has been instructed not to use cash collateral. The within case is now more than a week old and Debtor has neither confirmed that it isn't using cash collateral, nor sought a Court

authorizing the use of same over PUEFC's objection. Thus, either Debtor is using cash collateral in

gross violation of the Bankruptcy Code, or Debtor's operations are so dormant that it truly isn't

using cash collateral. Either option warrants, candidly, a dismissal of the within case. Such a gross

violation of the Bankruptcy Code would be the essence of "bad faith. See In re SGL Carbon Corp.,

200 F.3d 154, 165 (3d Cir. 1999) ("defining bad faith as a pattern of concealment, evasion, and

direct violations of the Code or court order which clearly establishes an improper motive . . . .")

(citation and internal quotations omitted). And, certainly if Debtor doesn't even have a need to use

cash collateral, it is a *per se* admission that Debtor is no longer a viable concern. It's axiomatic that

a debtor needs the use of cash collateral to run its business – e.g., to pay suppliers and utilities, to

make payroll (which, upon information and belief, is to be weekly, on Wednesdays), and to pay

insurance premiums. In fact, Debtor's business insurance premium was due and the payment was

not made. Therefore, it is clear that Debtor's business operations have all but ceased to exist.

### b)    *Simple arithmetic demonstrates that Debtor cannot service a plan of reorganization*

As set forth in the Remias Cert., as of August 7, 2015, PUEFC is owed $6,199,739.78, plus

late charges, attorneys' fees, costs, and continuing interest. At the most favorable of terms -- for

example, 0.00% interest over five years (the original term of PUEFC's loan[4]), Debtor would have to

pay PUEFC $103,329.00 per month, *more than four times Debtor's annualized gross monthly*

*revenues*. That's without factoring in payments to other creditors (and there's at least one other

creditor with a judgment of nearly $1,000,000.00), much less payroll for employees, insurance costs,

utilities, and other ordinary monthly expenses. Of course, at the very least PUEFC should be entitled

---

[3] As set forth below in Point II, its axiomatic under the Bankruptcy Code, Debtor may not use cash collateral absent PUEFC's consent or a Court order.
[4] Under the Loan Documents and Restructure Agreement, Debtor never had more than 62 months to repay the indebtedness owed.

to interest at the market rate of interest (the Court can take judicial notice that the 6% per annum

provided for in the Restructure Agreement (Ex. G to the Remias Cert.) is in line, if not less than,

current market rates on commercial loans).  At 6% per annum over the longest possible term of 5

years, Debtor would have to pay PUEFC $119,858.34 per month, *more than five times Debtor's*

*annualized gross monthly revenues*.

Thus, simple arithmetic proves that Debtor cannot even service PUEFC's debt at the most

favorable (and unlikely) of terms.

> c)       *Debtor cannot overcome 11 U.S.C. §1129(a)(8)'s plan confirmation*
> *requirements, and even if it could, Debtor cannot meet the cramdown*
> *standards under 11 U.S.C. §1129(b)*

Even assuming *arguendo* Debtor had sufficient income, Debtor has no possibility of

confirming a plan of reorganization because Debtor cannot overcome the requirements of 11 U.S.C.

§1129.  In order to confirm a plan of reorganization, the Court must find that:

> either (1) that all applicable requirements of § 1129(a) have been met, or 2) if the only
> condition to confirmation that is not satisfied is § 1129(a)(8), that the plan satisfies
> "cramdown" standards under § 1129(b), i.e., the plan "does not discriminate unfairly" against
> and is "fair and equitable" with regard to each impaired class that has not accepted the plan.
> In re Orchards Vill. Invs., 2010 Bankr. LEXIS 48, *3 (Bankr. D. Or. Jan. 8, 2010).

Debtor cannot satisfy 11 U.S.C. §1129 (a)(8) which requires that each impaired class of

claims must accept the plan unless Debtor can satisfy 11 U.S.C. §1129(b) which requires that the

plan "does not discriminate unfairly" against and is "fair and equitable" with regard to each impaired

class that has not accepted the plan.  As a matter of law, Debtor could not meet its burden with

regard to PUEFC.  First, unless Debtor intends to pay PUEFC the full balance of the debt owed

under the exact same terms as the Restructure Agreement, it is indisputable that PUEFC is an

impaired secured creditor under the broad definition of 11 U.S.C. §1124.  "*[A]ny* change in legal,

equitable or contractual rights creates impairment".  In re Taddeo, 685 F.2d 24, 28 (2d Cir. 1982)

(emphasis not added); see also In re L & J Anaheim Assocs., 995 F.2d 940, 942 (9th Cir. Cal. 1993) ("Indeed, we ourselves have suggested that under this broad definition, any alteration of the rights constitutes impairment even if the value of the rights is enhanced") (citations and internal quotations omitted).  Second, Debtor could not meet the "fair and equitable" cramdown standards.  Plans proposing the restructure of short term pre-petition, matured loans over seven years failed to meet the "fair and equitable" burden of 11 U.S.C. §1129(b).  In re Orchards Village Invs., LLC, 2010 Bankr. LEXIS 48, at *51-53; In re Tri-Growth Centre City, Ltd., 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992).  As set forth above, under the Restructure Agreement Debtor was to pay the debt over 5 years.  However, even assuming Debtor was afforded the seven years disapproved by the In re Orchards court, Debtor could not service the debt owed to PUEFC, let alone service other creditors' debts and meet its normal business operating expenses.  At 0.00% interest over 7 years, Debtor would have to pay PUEFC the $6,199,739.78 debt at $73,806.43 per month, *almost three times Debtor's annualized gross monthly revenues*; at 6% interest, that payment would jump to $90,569.24 per month.  Thus, Debtor cannot possibly propose any time frame to pay PUEFC which would satisfy the "fair and equitable" requirement.

It is therefore axiomatic that a plan of reorganization has no likelihood of confirmation.  Thus, the within bankruptcy case should be dismissed, or the alternative converted to a Chapter 7 liquidation.

## POINT TWO

**I.**     **DEBTOR HAS FAILED TO SATISFY THE STRICT STANDARD FOR THE USE OF CASH COLLATERAL AND AS SUCH, IN THE UNLIKELY EVENT THE COURT DOES NOT DISMISS OR CONVERT THE WITHIN BANKRUPTCY CASE, THE COURT SHOULD PROHIBIT DEBTOR FROM THE CONTINUED USE OF CASH COLLATERAL**

## A. **Debtor Has Failed to Meet the Strict Scrutiny Standard for the Use of Cash Collateral.**

In the unlikely event this Court were not to dismiss (or convert) this Chapter 11 case, Debtor should nonetheless be prohibited from the continued use of cash collateral. It is axiomatic that a debtor may not use cash collateral without the consent of the secured creditor or a court order. 11 U.S.C. §363(c)(2). In fact, the use of cash collateral is one of the few areas of the Bankruptcy Code in which the burden is on the debtor to establish it's entitled to use a secured creditor's collateral because it's highly transient and easily convertible collateral. Its use without permission (whether via consent of the secured creditor or a court order) is a gross violation of the bankruptcy code. It is critical to note that a debtor's burden under 11 U.S.C. §363 to prohibit the use of cash collateral is stiffer than the burden for withstanding a motion for relief from the automatic stay under 11 U.S.C. §362. In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 376, 385 (Bankr. E.D. Pa. 1987). This is so because, as opposed to a lift stay scenario where a creditor's recovery and use of its collateral is only delayed, in the cash collateral context the creditor's collateral is being used and consumed by the debtor. See In re Polzin, 49 B.R. 370, 371-72 (Bankr. D. Minn. 1985) (citations omitted); see also In re Walker, 2011 Bankr. LEXIS 690 (Bankr. C.D. Ill. Mar. 7, 2011) (citing In re Polzin). The standard of proof is "clear and convincing evidence that [the secured creditor] will realize the value of its bargain in light of all the facts and circumstances of the case." In re Sheehan, 38 B.R. 859, 868 (Bankr. D.S.D. 1984).

Here, Debtor does not even come close to satisfying this strict standard and, as such, in the unlikely event the Court does not dismiss or convert the within case, Debtor should be prohibited from the continued use of cash collateral. First, PUEFC does not consent to Debtor's use of cash collateral and objected to use of same on the day the Petition was filed. See letter to

Debtor's counsel, dated August 10, 2015, Exhibit "A" to the Chait Cert. Debtor's counsel advised

on August 12th that Debtor has been advised not to use any cash collateral. See Exhibit "B" to Chait

Cert. Notably, counsel did not confirm that Debtor isn't using cash collateral, only that Debtor has

been instructed not to use cash collateral. The within case is now more than a week old and Debtor

has neither confirmed that it isn't using cash collateral, nor sought a Court authorizing the use of

same over PUEFC's objection. Either Debtor is using cash collateral in gross violation of the

Bankruptcy Code, or Debtor truly isn't using cash collateral because its operations have ceased.

Either option warrants, candidly, a dismissal of the within case, let alone an order prohibiting the

use of cash collateral. Certainly if Debtor isn't even using cash collateral, it is a *per se* admission

that Debtor is no longer a viable concern. It's axiomatic that a debtor needs the use of cash

collateral to run its business – e.g., to pay suppliers and utilities, to make payroll (which, upon

information and belief, is to be weekly, on Wednesdays), and to pay insurance premiums. In fact,

Debtor's business insurance premium was due and the payment was not made. Therefore, it is clear

that Debtor's business operations have all but ceased to exist. This, of course, further supports the

analysis in Point I above that based on the anemic gross revenues, inability to procure union work

due to a nearly $1 million debt to the union, and lack of financials or fresh aging reports,  Debtor

cannot, as a matter of law, confirm a plan of reorganization.

Therefore, Debtor simply cannot provide clear and convincing evidence that PUEFC

"will realize the value of its bargain in light of all the fact and circumstances of the case." As such,

in the unlikely event this Court were not dismiss to convert the within case, the Court, must as a

matter of law, prohibit Debtor's use of cash collateral.

**B. <u>Even if the Court Were to Consider the Alternative Relief of Adequate Protection as to the Cash Collateral, It is Simply Not Possible to Adequately Protect PUEFC.</u>**

In the unlikely event the Court does not dismiss or convert this case or, and in the even more unlikely event the Court were to consider allowing Debtor the continued use of cash collateral, Debtor would be required to provide sufficient adequate protection.  Adequate protection on the cash collateral assets requires, at the least, the grant of a replacement lien and sufficient proof that Debtor's accounts, accounts receivable and inventory are equal to or greater – in amount and quality – to its pre-petition accounts receivable and inventory.  Significantly, to date, Debtor has failed to file any schedules or provide any current accounts receivables aging reports or projections.  Clearly, Debtor cannot meet its burden of proof without submitting any such documentation, and when combined with Debtor's dire financial condition, it is clear Debtor could not possibly adequately protect PUEFC.

## CONCLUSION

For all the foregoing reasons, PUEFC respectfully requests that this Court grant PUEFC's motion and immediately dismiss the within bankruptcy case (or convert it to a Chapter 7 liquidation). Alternatively, PUEFC respectfully request that this Court enter an order prohibiting Debtor from using cash collateral.

Respectfully submitted,

PERETORE & PERETORE, P.C.
Attorneys for People's United
Equipment Finance Corp.

By: */s/ Scott D. Chait*
    Scott D. Chait, Esq.

Dated: August 18, 2015